UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BAYSTATE FORD INC., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CDK GLOBAL, LLC and THE REYNOLDS AND REYNOLDS COMPANY,<br><br>Defendants. | No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND CONSUMER PROTECTION LAWS AND FOR UNJUST ENRICHMENT<br><br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff Baystate Ford Inc.,[1] individually and on behalf of all others similarly situated ("Plaintiff"), by and through its attorneys, submits this Class Action Complaint for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state consumer protection and unjust enrichment laws, against the defendants named herein. Plaintiff alleges the following based upon information and belief except as to those allegations that are based on Plaintiff's personal knowledge.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this action, individually and on behalf of all automobile dealerships that purchased dealer management systems ("DMS") software between January 1, 2015 and the present (the "Class Period") from defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") (collectively, "Defendants"). As detailed herein, this class action arises out of Defendants' illegal overarching scheme to restrain competition in the DMS markets, create side-by-side data monopolies, and artificially raise prices to automobile dealers as well as downstream purchasers that require access to DMS data to provide a variety of important services to dealers.

2.      The DMS is a bundled management information system and software that manages and integrates all critical functions of a car dealership, including, among other things, sales, financing, inventory management (including vehicle and parts), repair and service, accounting, payroll and marketing. The DMS also includes a database and data storage component that allows dealerships to enter and store data in real time. The DMS data is typically stored either onsite at the dealership, offsite at private data centers operated by the DMS providers, or with third-party "cloud-

---

[1]      Baystate Ford Inc. operates Baystate Ford and Baystate Pre-Owned in Massachusetts.

based" data storage companies. Wherever the data is physically stored, the data itself unquestionably belongs to the dealerships, a fact explicitly recognized by both CDK and Reynolds.

3. The DMS is a critical component of operations for dealerships, including the dealerships owned and maintained by Plaintiff and all other members of the Class and Massachusetts Subclass (as defined herein). Indeed, the DMS is widely considered the "central nervous system" of a dealership, and industry publications note that it is "impossible to operate without it."

4. For more than three decades, CDK and Reynolds have been by far the most dominant DMS providers in the market, and are regularly described in industry publications as the "Duopoly" and/or the "Big 2." Indeed, CDK and Reynolds, with total annual revenues of approximately $2.2 billion and $1.7 billion, respectively, currently control a combined 75% of the market in the United States measured by the number of franchised stores, and more than 90% measured by the number of vehicles sold from franchised dealers. Of the above-noted 75%, CDK accounts for approximately 45%, with Reynolds controlling the other 30%. The remaining 25% is divided among various other DMS providers, which are significantly smaller and typically cater to smaller dealerships in niche submarkets.

5. Defendants continued their domination of the DMS market through three primary means. First, CDK and Reynolds lock dealerships into long-term service contracts for DMS. These contracts typically last between five and seven years and often include terms that force automatic extensions and higher monthly fees if new services are ordered in the middle of the contracts. Second, switching DMS providers is incredibly expensive, cumbersome, inconvenient and highly disruptive to dealership business. For example, changing DMS providers requires new hardware and software, can cost as much as $50,000 up front, and typically requires up to a year or more for preparation and training of a dealership's employees. To make matters worse, Defendants regularly

resist providing any assistance with the transition process. Third, as further detailed herein, Defendants block access to dealership data, thus requiring dealerships to use Defendants' services to utilize their own data. These significant hurdles are designed to ensure that dealerships remain with CDK or Reynolds and empower Defendants to charge exorbitant data access fees.

6.     As noted above, Defendants recognize that dealerships own their ***own*** data. Nonetheless, CDK and Reynolds have used a variety of improper tactics to wrongfully ***control*** dealership data for Defendants' gain. Defendants' control allows them to charge exorbitant data access fees to third-party vendors ("Vendors") that are contracted by the dealerships to perform a variety of necessary business functions, such as dealership inventory management, customer relationship management, warranty services, repair orders and electronic vehicle registration and titling. To perform these necessary functions, Vendors' applications require access to a dealership's DMS data, which they acquire through Data Integrators ("Integrators"). Integrators extract data from DMS databases, aggregate and standardize the data, and deliver it to Vendors ("Integration Services"). A single dealership typically uses multiple Vendors, each requiring access to the dealership's data stored in the DMS database. Integrators charge Vendors for their services, and these charges are ultimately passed down as costs to the dealerships.

7.     Historically, the Integrator market flourished, with numerous competing Integrators vying to provide affordable, secure and reliable access to DMS data for dealerships and Vendors. CDK and Reynolds have long been two such competitors, each selling their Integration Services, including CDK's "Third Party Access" or "3PA" and Reynold's "Reynolds Certified Interface" or "RCI." During the time that competition flourished, Vendors provided innovative software application products to help dealerships sell and service vehicles. In or around 2011, however, Integrator competition hit its first road block when Reynolds began blocking other Integrators,

including CDK, from accessing DMS data on Reynolds' platforms by disabling Integrator login credentials. CDK did not follow suit at the time, however, and instead continued to allow other Integrators, including Reynolds, to access DMS data on CDK platforms. As CDK lamented in communications to dealerships at the time:

> Reynolds has instituted policies designed to prevent automated processes such as those used by [CDK's Integration Services] and other third-party data-collection services from collecting data for programs you have enrolled in. . . . In short, when [Reynolds] blocks our access to your data on your dealership management system, we cannot perform the tasks you have asked us to perform.

8.     Despite Reynolds' DMS data blocking attempts, however, CDK implemented a work-around solution called "SMART-R," which allowed CDK to continue to perform Integration Services on Reynolds-held DMS data. SMART-R used an automated process to capture Reynolds' DMS data reports, thus allowing CDK to continue to pull dealer data from Reynolds' DMS database and continue to provide various Integrator- and Vendor-related services to dealerships that used Reynolds' DMS. As a result of CDK's SMART-R work-around, CDK continued to compete directly with Reynolds' own RCI Integrator product.

9.     On February 18, 2015, everything changed when CDK and Reynolds entered into an anticompetitive written agreement, described as a "Wind Down Access Agreement," to destroy Integrator competition. Through the agreement, which was designed to divide and conquer the Integrator market, CDK and Reynolds agreed to no longer compete in the Integration Services market. In particular, CDK agreed that it would no longer compete in providing access to dealer data on Reynolds' DMS, ceding that ground exclusively to Reynolds. Because Reynolds already did not compete with CDK in providing dealers with data using the CDK DMS, the agreement ensured that CDK and Reynolds would be the exclusive Integration Services providers for data on their respective DMS platforms. Further, pursuant to the agreement, CDK and Reynolds agreed to block

- 4 -

all independent Integrators from accessing Defendants' DMS data, and CDK agreed to transition all of CDK's Vendor clients that were using Reynolds' DMS onto Reynolds' RCI program.

10. As a result of Defendants' illegal horizontal agreement going forward, Vendors' only option in obtaining data from CDK's and Reynolds' DMS platforms is to pay CDK and Reynolds for such data access. With competition effectively foreclosed on the Integration Services market, Defendants are now able to charge artificially inflated prices to Plaintiff and members of the Class and Massachusetts Subclass and for access to the dealerships' own data.

11. In addition to the above, Defendants now charge exorbitant data access fees to Vendors, who now charge dealers significantly higher fees for the performance of various critical business tasks. Defendants prohibit Vendors from informing dealerships about the reasons for the fee increases in order to prevent dealerships from discovering that the increased Vendor fees are the result of Defendants' increased DMS data access fees. Indeed, prior to the illegal agreement, Integrators (including CDK subsidiaries) typically charged Vendors about $50 per month per dealership for Integration Services. Following the illegal agreement, however, CDK and Reynolds began charging Vendors an average of $300 per month for the same services, and some Vendors are charged as much as $800 per month. Again, this cost is passed down to dealerships such as Plaintiff and other members of the Class and the Massachusetts Subclass, though Vendors are not allowed to inform dealerships that the cost increase is the result of Defendants' increased charges.

12. Defendants' actions prevented Plaintiff and the Class and the Massachusetts Subclass from receiving the benefits of a fair and competitive marketplace for DMS and Integration Services. Defendants were able to charge higher prices than would otherwise have prevailed had there been full competition among the Defendants and, as a result of Defendants' conduct, Plaintiff and

members of the Class and Massachusetts Subclass paid higher prices for DMS and Integration Services than they otherwise would have.

## JURISDICTION AND VENUE

13.     Plaintiff's action arises under §§1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2 (and under 15 U.S.C. §3 for residents of the District of Columbia and U.S. territories). Plaintiff seeks damages under §4 of the Clayton Antitrust Act, 15 U.S.C. §15, as well as injunctive relief under §16 of the Clayton Antitrust Act, 15 U.S.C. §26.

14.     This Court has subject-matter jurisdiction over Plaintiff's claims under 15 U.S.C. §15, 28 U.S.C. §1331, and 28 U.S.C. §1337.

15.     This Court has subject-matter jurisdiction over the state-law claims pursuant to 28 U.S.C. §§1332(d) because this is a class action with more than 100 putative class members, at least one plaintiff is a citizen of a state different from the Defendants, and the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs. This Court also has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. §1367 because the state-law claims are so closely related to the federal claims that they form part of the same case or controversy.

16.     The Court has personal jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (i) transacted business throughout the United States, including in this District; (ii) sold DMS and Integration Services throughout the United States, including in this District; (iii) had substantial contacts with the United States, including in this District; and/or (iv) was engaged in an unlawful restraint of trade which injured persons residing in, located in, or doing business throughout the United States, including in this District.

17.     Defendants engaged in conduct inside the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States. The activities of Defendants were within the flow of, were intended to, and did have,

a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

18.    The anticompetitive conduct, and its effects on U.S. commerce described herein, proximately caused antitrust injury to Plaintiff and members of the Class and the Massachusetts Subclass in the United States.

19.    By reason of the unlawful activities alleged herein, defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class and Massachusetts Subclass.

20.    Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States, including Plaintiff and members of the Class and the Massachusetts Subclass.

21.    Venue is proper in this District pursuant to §12 of the Clayton Antitrust Act, 15 U.S.C. §22. and 28 U.S.C. §1391(b)-(d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, has agents in or is found or transacts business in this District.

**PARTIES**

22.    During the Class Period, plaintiff Baystate Ford Inc. ("Baystate Ford") purchased DMS directly from CDK, and also purchased Vendor services from third parties that are required to pay CDK for Integrator access to plaintiff Baystate Ford's dealership data. Plaintiff Baystate Ford is a resident of South Easton, Massachusetts. Baystate Ford paid supracompetitive prices for its DMS. Baystate Ford also paid supracompetitive prices for Integration Services because the Vendors from which Baystate Ford purchased software applications passed on Defendants' inflated data integration fees.

23.     Defendant CDK is a Delaware limited liability company with principal executive offices located at 1950 Hassell Road, Hoffman Estates, Illinois.  CDK is the operating subsidiary of CDK Global, Inc.  CDK is a global provider of integrated information technology and digital marketing solutions to the automotive retail and adjacent industries.

24.     Defendant Reynolds is an Ohio corporation with principal executive offices located at One Reynolds Way, Dayton, Ohio.  Reynolds is a provider of software, services and document solutions for automotive retailers.  Reynolds has 4,300 associates worldwide with major U.S. operations in Texas and Ohio, as well as operations in Canada, the United Kingdom and across Europe.

25.     Various others, presently unknown to Plaintiff, participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in furtherance of those violations.  The acts charged in this Complaint have been done by Defendants and their co-conspirators or were authorized, ordered or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

## INTERSTATE TRADE AND COMMERCE

26.     The actions complained of in herein have restrained and adversely affected interstate commerce because Defendants provide their products and services across the nation, and the markets for DMS and Integration Services are both nationwide markets.  Furthermore, during the Class Period, Defendants sold a substantial amount of DMS and provided extensive Integration Services within the continuous and uninterrupted flow of interstate and foreign commerce and, as intended, their actions substantially affected that commerce.

## THE DMS MARKET

**The Relevant DMS Market**

27.     The DMS is software that is critical to operations for automotive dealerships. Although DMS software that is made by different providers typically utilizes substantially different interfaces and/or hardware, all DMS provide similar functionality to dealerships. Specifically, the DMS manages and integrates almost all of the critical functions of a car dealership, including, among other things, sales, financing, inventory management (including vehicle and parts), repair and service, accounting, payroll and marketing. The DMS also has a database component that allows dealerships to input and store relevant data related to daily business operations.

28.     The DMS is a critical component of operations for dealerships, including the dealerships owned and maintained by Plaintiff and the Class and Massachusetts Subclass. Indeed, the DMS is widely considered the "central nervous system" of a dealership and industry publications note that it is "impossible to operate without" the DMS.

29.     The DMS market is comprised of various providers, such as CDK and Reynolds, that license and sell their DMS software and services pursuant to written contracts. Here, the relevant market is the DMS market in the United States.

**The Relevant Integration Services
and Vendor Markets**

30.     The Integration Services market is comprised of companies that provide DMS data-related services to dealerships and to Vendors contracted by dealerships. In particular, these Integrators gather, format and aggregate data from a DMS, and then provide the necessary data to

Vendors or other related parties that use the data to perform various critical functions for dealerships.[2]

31.     Dealerships use software applications created and/or sold by Vendors to perform a variety of necessary operational functions, including vehicle inventory management, customer relationship management, electronic vehicle registration, titling and scheduling of vehicle service and repair appointments.  A single dealership typically uses up to a dozen or more separate Vendors, most of which rely on obtaining the dealership's DMS data from DMS providers (with consent from the respective dealerships).  For example, Plaintiff uses numerous Vendors, each performing critical functions to Plaintiff's business.

32.     CDK and Reynolds both operate their own Vendor services, many of which compete with third-party Vendor services.  Defendants also each have their own Integration Services.  CDK's and Reynolds' Vendor services are able to use their own Integration Services to pull relevant DMS data from their respective DMS databases.  In contrast, a third-party Vendor's only option to access such data is through the DMS database by way of an Integrator.  For example, a third-party Vendor that provides electronic vehicle registration and titling services must first retrieve purchaser, vehicle and financing information from the DMS database through an authorized Integrator.  Without access to such data, Vendors cannot register and title the car.

33.     Historically, several companies operated in the Integrator market to provide highly competitive rates.  Today, there are only three companies that provide Integration Services – CDK, Reynolds and the last-standing competition, a company called Authenticom, Inc. ("Authenticom").  All other Integrators have been driven out of the market by Defendants' anticompetitive behavior.  Of note, Authenticom commenced proceedings against Defendants CDK and Reynolds, alleging that

---

[2]   For example, car manufacturers need access to dealer data to manage car and parts inventories and process warranty claims or recall notices, among other things.

both companies violated antitrust laws, including the Sherman Antitrust Act, by engaging a coordinated campaign to illegally block Authenticom's Integrator access to dealer data and wrongfully drive Authenticom out of the Integration Services market. In the suit, Authenticom sought and was initially granted a preliminary injunction against CDK and Reynolds in connection with Defendants' illegal horizontal conspiracy. The injunction order, however, was successfully appealed, but only because it went "well beyond the scope of the alleged violation."

**The Demand for DMS and Integration
Services Is Inelastic**

34.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "elastic" if an increase in the price of a product results in diminished revenues, with declines in the quantity sold of that product outweighing the effects of higher prices. For products with a highly elastic demand, customers have many feasible alternatives for cheaper products of similar quality and decrease purchases sharply in the face of even a small price increase. Here, the demand for the DMS is inelastic, it is "impossible to operate without" the DMS, and there are no reasonable substitutes for the DMS software and services provided to dealerships by DMS providers such as Defendants. Similarly, the demand for Integration Services is inelastic, because Integration Services are a necessary component of the DMS.

35.     Markets with lower elasticity facilitate collusion, allowing producers to raise their prices without triggering customer substitution and sufficient lost sales revenues as to offset the beneficial effect of higher prices on profits for products they still continue to sell.

36.     DMS providers license and sell their software and services to automobile dealerships pursuant to long-term written contracts, with CDK's and Reynolds' contracts typically lasting between five and seven years in length, and often include terms that force automatic extensions and

higher monthly fees if new services are ordered in the middle of the contracts. For example, Plaintiff's contract with CDK lasts for "a period of 60 months" (or five years), and each term for five years of service "commence[s] on the respective installation date of [each specific component of CDK's products utilized by Plaintiff]." A dealership has only one DMS provider at a time and it would be functionally impossible for a dealership to operate with two separate DMS platforms given that the different platforms are incompatible and each requires its own operating software and hardware. Further, it is not only prohibitively costly for dealerships to switch DMS providers, but also highly disruptive given that it changes nearly every process that a dealership uses to operate and requires approximately one year of preparation, staff training and testing before the new DMS is even put into operation. To make matters worse, CDK and Reynolds often punish dealerships that try to switch DMS providers, including through litigation, by restricting critical Vendor applications from accessing dealerships' data, and by refusing to provide assistance with the logistical changes involved in switching DMS providers.

37. One industry executive stated that changing DMS providers "is akin to a heart transplant." CDK's CEO acknowledged on a November 2016 conference call that "switching DMS providers can be very difficult. It [is] quite a process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch."

38. Given the above, only a small percentage of dealers are even eligible to switch DMS providers each year, and even fewer actually attempt to make the switch. As such, following a dealership's initial DMS purchase, dealerships exert little choice in the particular DMS they will buy thereafter, and DMS purchasers will continue to use and acquire DMS from the same provider they initially chose, even if there is an artificial increase in price. Choice in the Integrator Services

- 12 -

market is likewise extremely limited because Defendants allow only their Integrator subsidiaries to scrape data from their respective DMS.

**The DMS and Integration Services Market
Is Highly Concentrated**

39.    For more than three decades, Defendants CDK and Reynolds have been by far, the most dominant DMS providers in the market, with current annual revenues of approximately $2.2 billion and $1.7 billion, respectively.  These two powerhouses are regularly described in industry publications as the "Duopoly" and/or the "Big 2," with good reason.  In particular, CDK and Reynolds currently control a combined 75% of the market in the United States measured by the number of franchised stores, and more than 90% measured by the number of vehicles sold from franchised dealers.  Of the above-noted 75%, approximately 45% is controlled by CDK, and approximately 30% is controlled by Reynolds.  The remaining 25% is divided among various other DMS providers, which are significantly smaller and typically cater to smaller dealerships in niche submarkets.  As alleged above, the Integration Services market is likewise concentrated, with only Authenticom and Defendants' subsidiaries providing Integration Services.

## ANTICOMPETITIVE CONDUCT BY THE DEFENDANTS

40.    Defendants are horizontal competitors.  For years, CDK and Reynolds competed in the market for DMS and Integration Services.

41.    As detailed below, the conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained or made artificial prices for DMS sold directly to dealerships, and for DMS data access by Vendors and Integration Services, costs of which are ultimately born by dealerships.  Defendants' conspiracy constitutes a *per se* violation of the Sherman Antitrust Act and the Massachusetts General Laws ch. 93A, §1, *et seq.*

42.     At all relevant times, other corporations, individuals and entities willingly conspired with Defendants in their unlawful and illegal conduct.  Numerous individuals and entities participated actively during the course and in furtherance of the scheme described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of DMS and DMS data access prices in the United States and Massachusetts.

43.     On February 18, 2015, CDK and Reynolds entered into a written agreement to stop competing in the market for Integration Services.  Pursuant to the agreement, referred to as the "Data Exchange Agreement" or "Wind Down Access Agreement," Defendants divided the market by agreeing that, in contrast to the previous decade, CDK would no longer compete in providing access to Integration Services for data on the Reynolds DMS.  The agreement ensured that Defendants would be the exclusive providers of Integration Services for dealer data on their respective DMS platforms.  The agreement further required that all of CDK's Vendor clients that used CDK's Integration Services to access Reynolds' DMS data would be transitioned to Reynolds' Integration Services.

44.     More specifically, in the Data Exchange Agreement, CDK agreed to a wind-down of the CDK subsidiaries that had scraped data from Reynolds' DMS.  During the wind-down period, CDK agreed that the subsidiaries would not scrape data from Reynolds' users without Reynolds' permission. In turn, Reynolds agreed that it would not block the two subsidiaries from obtaining access to its system during the wind-down.  CDK also promised that it would help its subsidiaries' clients (that is, the third-party app providers who used the subsidiaries to collect data from the Reynolds system) to move away from using CDK's subsidiaries' services, over to Reynolds' in-house Integrator, RCI.  Finally, the Data Exchange Agreement committed both Reynolds and CDK

- 14 -

not to help anyone else gain access to the other company's DMS without permission. Other agreements between CDK and Reynolds were called the 3PA and RCI agreements. In these agreements, each company promised to allow the other company's proprietary integration software to have access to its DMS. Thus, for instance, CDK's 3PA software was entitled to take data from the Reynolds' system. The parties agreed that neither would use any unauthorized or unsecured methods of obtaining access to the other's DMS.

45.     On March 2, 2015, CDK sent a letter to its Vendor clients announcing that the Vendors "will be provided with a roadmap to transition to the Reynolds [Integration Services or RCI] program without any further risk of interruption to existing services," and that the "transition period [would] allow time for [CDK's Integration Services] clients to enroll in the RCI program in support of your [Reynolds] dealers." The letter further assured Vendors that CDK would "assist [Vendors] to facilitate a smooth transition."

46.     On April 1, 2015, CDK sent its Vendor customers a follow-up letter noting that CDK and Reynolds were "now in the transition period," providing the deadline for RCI certification, and noting that if the Vendor was "not RCI Certified, it will be more difficult to reliably receive dealership data since [CDK's Integration Services] is no longer extracting data directly from Reynolds systems."

47.     Defendants' conduct harmed Plaintiff, the Class and the Massachusetts Subclass by depriving them of a marketplace in which consumers of DMS make their decisions about the purchase of DMS and Integration Services free from the influence of Defendants' horizontal agreements.

48.     Following the illegal agreements, Defendants both imposed exclusive provisions in dealer contracts restricting dealerships from providing access to their own data to anyone else.

Similarly, CDK and Reynolds imposed exclusive provisions in Vendor contracts restricting Vendors from obtaining dealer data from anyone other than CDK and Reynolds through their respective DMS and Integration Services. These exclusive provisions have effectively foreclosed the entire independent Integration Services market for any dealerships using either the CDK or Reynolds DMS platforms.

49. Recent testimony in Authenticom's preliminary injunction proceedings has confirmed that CDK and Reynolds specifically sought to destroy the entire independent Integration Services market. For example, a Reynolds executive told Authenticom's CEO that Reynolds had made agreements with CDK to "block independent integrators" and that Reynolds' owner was "adamant" about cutting off Integrators. Separately, a CDK executive told Authenticom's CEO that Defendants had agreed to "[l]ock [Authenticom] and the other third parties out" and that the representative was "mandated by [CDK's] new CEO to seek you out and destroy your business on our systems." The CDK executive warned Authenticom's CEO, "you have built a great little business, get something for it before it is destroyed otherwise I will f***ing destroy it."

50. CDK's and Reynolds' standard DMS contracts, which last between five to seven years (or more), prevent dealerships from authorizing access to their own DMS by third-party Vendors of their own choice, and at the same time explicitly authorize CDK and Reynolds to access such data and provide it to Vendors. In particular, the standard Reynolds Master Agreement states that dealers cannot "provide access to any Licensed Matter [the Reynolds DMS software] or non-public portions of the Site to any third party." Similarly, CDK's standard Master Services Agreement states that the "**[DEALER] IS NOT AUTHORIZED TO CAUSE OR PERMIT ANY THIRD PARTY SOFTWARE TO ACCESS [THE] CDK DEALER MANAGEMENT SYSTEM EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT**." As a result,

third-party Vendors have no option to obtain and utilize dealerships' DMS data that use CDK's or Reynolds' DMS platforms, other than to pay CDK or Reynolds for access to such data.

51.     Defendants' price-fixing conspiracy had the following anticompetitive effects, among others: (i) price competition has been restrained or eliminated with respect to DMS and DMS data extraction in the United States and Massachusetts; (ii) dealerships and Vendors that need access to dealership data stored on Defendants' DMS databases must use the respective Integration Services of CDK or Reynolds and cannot use cheaper/better Integrators; (iii) the prices of CDK's and Reynolds' Integration Services have skyrocketed; and (iv) purchasers of DMS and Integration Services have been deprived of free and open competition. During the Class Period, Plaintiff and the members of the Class and the Massachusetts Subclass paid supracompetitive prices for DMS sold directly to dealerships, and supracompetitive prices for Vendor access to DMS data. Indeed, prior to the illegal agreement, when Integrator competition flourished, Vendors typically paid between $30 and $75 per month to Integrators for the necessary DMS data access. Now that Vendors are required to use the Integration Services of CDK and Reynolds to access dealership data on their respective DMS services, CDK and Reynolds charge Vendors exorbitant fees averaging $300 per month in order for Vendors to access the dealers' own data, and some Vendors are charged as much as $800 per month. These fees are passed down from Vendors to the dealerships, including Plaintiff and members of the Class and the Massachusetts Subclass, thus forcing dealerships to pay excessive fees just so Vendors can access the dealers' own data.

52.     The U.S. Federal Trade Commission ("FTC") is also investigating Defendants' anticompetitive conduct and commenced an investigation. As stated by CDK in its public filings with the SEC, "On June 22, 2017, the Company received from the FTC a Civil Investigative Demand consisting of interrogatories and a request to produce documents relating to any agreements

between the Company and Reynolds and Reynolds. . . . At this time, the Company does not have sufficient information to predict the outcome of, or the cost of responding to or resolving this investigation."

53.     Plaintiff has suffered significant injury as a result of Defendants' DMS and DMS data extraction price manipulation conspiracy. Indeed, Plaintiff has purchased services from numerous Vendors and has been injured by paying supracompetitive prices for Vendor services as a result of Defendants' illegal agreement. Further, in effectively eliminating competition in the Integration Services market, Defendants have effectively eliminated competition in the DMS market. Because Defendants have utilized their market dominance to significantly reduce the number of Integrators and Vendors that are willing to provide their services to non-defendant DMS providers, dealers are necessarily forced to acquire DMS services from Defendants and pay supracompetitive prices for such services.

54.     By reason of the alleged violations of laws, Plaintiff and the members of the Class and the Massachusetts Subclass have sustained injury to their business or property in the form of the overcharges they paid for DMS and Integration Services. Plaintiff and members of the Class and Massachusetts Subclass paid more for DMS and Integration Services than they would have in the absence of Defendants' illegal contract, combination or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

55.     In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to fix, maintain, suppress, inflate and otherwise make artificial the price of DMS and Integration Services sold in the United States and to Massachusetts residents.

- 18 -

56.     Plaintiff and members of the Class and the Massachusetts Subclass suffered antitrust injury in that they paid more for DMS and Integration Services purchased from Defendants than they would have paid had the manipulation not occurred.

57.     Injury to Plaintiff and members of the Class and the Massachusetts Subclass also resulted from Defendants' deprivation of the benefits of free and open competition in the market for DMS and Integration Services.

## CLASS ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all Class members, defined as:

> All persons and entities that engaged in the business of retail vehicle sales in the United States who, between January 1, 2015 and the present (the "Class Period"), purchased the DMS directly from one or more of the Defendants, co-conspirators, or any predecessor, successor, subsidiary or affiliate of any Defendants, and directly or indirectly purchased CDK's or Reynolds' Integration Services from one or more of the Defendants, co-conspirators, or any predecessor, successor, subsidiary or affiliate of any Defendants.

59.     Plaintiff also brings this action on behalf of the Massachusetts Subclass, which is defined as:

> All persons and entities that engaged in the business of retail vehicle sales in the State of Massachusetts who, between January 1, 2015 and the present (the "Class Period"), purchased the DMS directly from one or more of the Defendants, co-conspirators, or any predecessor, successor, subsidiary or affiliate of any Defendants, and directly or indirectly purchased CDK's or Reynolds' Integration Services from one or more of the Defendants, co-conspirators, or any predecessor, successor, subsidiary or affiliate of any Defendants.

60.     The Class and the Massachusetts Subclass are ascertainable and are ones for which records should readily exist.

61.     Members of each class are so numerous that joinder is impracticable.  Plaintiff does not know the exact size of the Class and the Massachusetts Subclass, but because of the nature of the trade and commerce involved, Plaintiff believes that there are tens, if not hundreds, of thousands of

members as described above, the exact number and identities being known to Defendants and their

co-conspirators. Moreover, the members of the Class are dispersed across the United States and the

members of the Massachusetts Subclass are dispersed across the Commonwealth of Massachusetts.

62.     There is a well-defined community of interest among Plaintiff and the members of the

Class and Massachusetts Subclass. Because Defendants have acted in a manner generally applicable

to the Class and Massachusetts Subclass, questions of law and fact common to members of the Class

and Massachusetts Subclass predominate over questions, if any, that may affect only individual

members of the Class and Massachusetts Subclass. Such generally applicable conduct is inherent in

Defendants' wrongful and anticompetitive conduct.

63.     Among the questions of law and fact common to the Class and the Massachusetts

Subclass are:

(a)     whether Defendants and their co-conspirators entered into an agreement,

combination or conspiracy to fix, raise, maintain or stabilize the prices of DMS and Integration

Services sold in the United States, and/or prevent the dissemination of information concerning

Defendants' pricing of their Integration Services paid by Vendors and passed down to dealerships;

(b)     the identities of the participants of the alleged conspiracy;

(c)     the duration of the conspiracy alleged herein and the acts performed by

Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     whether Defendants' agreements and actions are *per se* unlawful because they

restrict competition;

(e)     whether Defendants' agreements and actions are unlawful under the rule of

reason;

(f)     whether Defendants possessed market power or monopoly power over sales of DMS and Integration Services;

(g)     whether Defendants' conduct affected interstate and intrastate commerce;

(h)     whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and the other members of the Class and/or the Massachusetts Subclass;

(i)     the effect of Defendants' alleged conspiracy on the prices of DMS and Integration Services;

(j)     whether the effects of Defendants' alleged conspiracy were anticompetitive in nature;

(k)     whether the conspiracy, as alleged in this Complaint, violated the Sherman Antitrust Act;

(l)     whether the conspiracy, as alleged in this Complaint, violated the Massachusetts General Laws ch. 93A, §1, *et seq.*; and

(m)     the appropriate nature of class-wide injunctive or other equitable relief.

64.     There are no defenses of a unique nature that may be asserted against Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class.

65.     There are no defenses of a unique nature that may be asserted against Plaintiff individually, as distinguished from the other members of the Massachusetts Subclass, and the relief sought is common to the Massachusetts Subclass.

66.     Plaintiff is a member of the Class and its claims are typical of the claims of the other members of the Class.  Plaintiff was damaged by the same wrongful conduct of Defendants.

67.     Plaintiff is a member of the Massachusetts Subclass and its claims are typical of the claims of the other members of the Massachusetts Subclass.  Plaintiff was damaged by the same wrongful conduct of Defendants.

68.     Plaintiff will fairly and adequately protect the interests of other Class and Massachusetts Subclass members because it has no interests antagonistic to, or that conflict with, those of any other Class or Massachusetts Subclass member.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent it and the other members of the Class and Massachusetts Subclass.

69.     A class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will enable a large number of similarly situated parties to prosecute their claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that would result if individual actions were pursued.

70.     This case is also manageable as a class action.  Plaintiff knows of no difficulty to be encountered in the prosecution of this action that would preclude its maintenance as a class action. In any event, the benefits of proceeding as a class action, including providing injured persons or entities with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this action as a class action.

71.     Defendants' unlawful acts alleged in this Complaint had a substantial effect on commerce and caused antitrust injury to Plaintiff, the Class and the Massachusetts Subclass.

72.     Defendants' unlawful acts had the purpose and effect of manipulating the price of DMS and Integration Services in the United States and to Massachusetts residents.

73.     As a direct result of Defendants' violations, Plaintiff and the members of the Class and Massachusetts Subclass have been damaged.

74.     As a direct and foreseeable result of Defendants' unlawful anticompetitive acts, the price of DMS sold directly to dealerships and DMS data access sold to Vendors and paid for by dealerships was manipulated and inflated.

75.     In addition, as a direct and foreseeable result of Defendants' unlawful anticompetitive acts, Plaintiff, the Class and the Massachusetts Subclass were deprived of the ability to receive truthful and non-misleading advertising.

## MONOPOLY POWER

76.     At all relevant times, Defendants had market power because they had the power to maintain the prices of DMS sold directly to dealerships and the price of Integration Services sold to dealerships and Vendors.  Indeed, following the 2015 agreement between CDK and Reynolds, and to this day, Defendants' prices for DMS are significantly higher than the prices currently charged by independent Integrators or previously charged by CDK and Reynolds in their respective capacities as Integrators.

77.     At all relevant times, Defendants operated in the relevant markets.  Defendants sold DMS directly to dealerships and sold Integration Services to Vendors that passed the costs on to dealerships, well in excess of Defendants' marginal costs and the competitive prices for DMS and Integration Services, and enjoyed the resulting high profit margins and corresponding financial benefits – to the financial detriment of Plaintiff and members of the Class and Massachusetts Subclass.

78.     Defendants, at all relevant times, had enjoyed high barriers of entry with respect to competition in the relevant product market due to long-term contracts spanning five years or more

with automatic extensions, the high cost and disruptive nature of changing DMS providers, and the ability to essentially hold dealership data for ransom.

## COUNT I

**Violations of §§1 and 3 of the Sherman Antitrust Act
for Entering a Horizontal Agreement to Reduce Competition
in the Integration Services Market
(On Behalf of the Class)**

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     CDK and Reynolds are horizontal competitors of one another in the DMS market and the Integration Services market.

81.     In February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the Integration Services market.  In so doing, CDK and Reynolds have entered into and continue to engage in an agreement in restraint of trade in violation of §§1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 3, and §4 of the Clayton Act, 15 U.S.C. §15.

82.     These horizontal market share agreements did reduce competition in the Integration Services market.  The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, and concerted action to eliminate competition in the DMS market and the Integration Services market.

83.     Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future and the Court remedies the conditions Defendants created in the DMS market and the Integration Services market.  Otherwise, Plaintiff and the Class will continue to pay more for DMS services and Integration Services than they would have in the absence of the conspiracy.  And

without swift action, any remaining competition in the data integration market will be permanently foreclosed.

84.     Each Defendant is jointly and severally liable for the harm caused by its conduct from the time each Defendant entered into an anticompetitive written agreement with each other Defendant to the present.

## COUNT II

### Violation of §§1 and 3 of the Sherman Antitrust Act, for Imposition of Exclusive Dealing Provisions (On Behalf of the Class)

85.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.     CDK and Reynolds entered into contracts with dealers and Vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of §§1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 3, and §4 of the Clayton Act, 15 U.S.C. §15.

87.     Pursuant to their conspiracy to eliminate competition in the Integration Services market, CDK and Reynolds inserted exclusive dealing provisions in their contracts with dealers and Vendors.  The contracts with dealers provide that dealers cannot provide access to their data to any Integrator except CDK or Reynolds.  Likewise, the contracts with Vendors provide that Vendors cannot obtain data for dealers who use CDK or Reynolds' DMS by employing an Integrator other than CDK or Reynolds.  These provisions are standard in all Defendants' contracts with dealers and Vendors.

88.     CDK and Reynolds were able to impose these exclusive dealing provisions on dealers and Vendors as a result of their market power in the DMS market and the Integration Services market.

- 25 -

89.     Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the Integration Services market these agreements are *per se* illegal.

90.     These exclusive dealing provisions have caused actual injury to competition in the DMS market and the Integration Services market.

91.     Defendants' exclusive dealing agreements do not enhance efficiency or competition in the DMS or Integration Services markets. On the contrary, the agreements have produced only anticompetitive effects in both markets.

92.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury to their business or property.

93.     Plaintiff and the Class are entitled to treble damages for violations of the Sherman Antitrust Act.

94.     Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to impose unlawful exclusive dealing provisions in the future and the Court remedies the conditions Defendants created in the DMS and Integration Services markets.  Otherwise, Plaintiff and the Class will continue to pay more for DMS and Integration Services than they would have in the absence of the conspiracy.  And without swift action, any competition in the data integration market will be permanently foreclosed.

## COUNT III

### Violation of §2 of the Sherman Antitrust Act for Monopolization of the DMS and Integration Services Markets (On Behalf of the Class)

95.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

96.     CDK and Reynolds have unlawfully monopolized the Integration Services market in violation of §2 of the Sherman Antitrust Act, 15 U.S.C. §2.

97.     In the primary DMS market, CDK and Reynolds have a longstanding duopoly. When dealers purchase CDK's or Reynolds' brand of DMS, they are locked in to that brand through a long-term contract (typically seven years) and the significant financial costs and time associated with switching to a new DMS platform. For example, one serious cost of switching is the amount of time that a dealer's DMS will be offline during a transition. Downtime occurs when the DMS needs to be taken offline, which prevents the dealer from performing any services that rely on the DMS, such as the ability to secure vehicle financing and consummate an auto sale, and other vital business functions.

98.     CDK and Reynolds used improper means to maintain their duopoly in the DMS market by technologically and contractually blocking Integrators from accessing dealers' data within Defendants' DMS platforms. By blocking access, CDK and Reynolds made migration of data from their DMS to a new DMS much more difficult because data migration Vendors and/or the new DMS provider are unable to access the old data to port it over to the new system.

99.     By willfully creating and maintaining customer lock-in in the DMS market, CDK and Reynolds have monopolized the market for DMS.

100.    CDK and Reynolds also used their market power to create and maintain a duopoly in the market for Integration Services, which is an aftermarket for DMS services. Each Defendant has created a total monopoly in the data integration aftermarket for their particular DMS platform because no other Integrator is currently allowed access to the data residing within CDK or Reynolds' platform. These platforms, however, were at one time open and allowed access to anyone authorized by the dealer to access the dealer's data.

101.    CDK and Reynolds used anticompetitive means to acquire and maintain monopolies in the market for Integration Services, including by blocking and disabling Integrators from

accessing dealer data, entering into a market division agreement pursuant to which they agreed not to compete in each other's aftermarkets, and imposing anticompetitive exclusive dealing arrangements on dealers and Vendors who were locked into their platform.

102.    Defendants' ability to exclude competition and impose massive price increases demonstrates their market power in the Integration Services market.  And such conduct has no pro-competitive business justification.

103.    As a direct and proximate result of CDK and Reynolds' unlawful use of their duopoly power, Plaintiff and the Class have suffered injury to their business or property.

104.    Plaintiff and the Class are entitled to treble damages for these violations of the Sherman Antitrust Act.

**COUNT IV**

**Violation of Massachusetts General Laws ch. 93A, §1, *et seq*.**
**(On Behalf of the Massachusetts Subclass)**

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable or deceptive acts or practices in violation of the Mass. Gen. Laws ch. 93A, §1, *et seq*.  Defendants were engaged in trade or commerce as defined by Mass. Gen. Law, ch. 93A.  Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which DMS and Integration Services were sold, distributed or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Massachusetts Subclass.

107.    This conduct on the part of Defendants constituted "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Mass. Gen. Laws ch. 93A, §§2 and 11. Defendants' unlawful acts had the following effects: (i) caused actual injury to competition for applications and in the DMS markets; (ii) increased pricing for DMS and Integration Services; (iii) caused Plaintiff, members of the Massachusetts Subclass, and other dealers to pay monopolistic prices; and (iv) forced DMS and Integration Services competitors out of the market.  During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and members of the Massachusetts Subclass have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, §§2 and 11, that were knowing or willful, and, accordingly, Plaintiff and members of the Massachusetts Subclass seek all relief available under that statute.

108.    Plaintiff's and the Massachusetts Subclass members' injuries are the type Massachusetts Consumer Protection Laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.  Plaintiff and the Massachusetts Subclass are entitled to injunctive relief, treble damages, attorneys' fees, reasonable expenses and cost of suit for the violations alleged herein.

### COUNT V

### Unjust Enrichment
### (Against Defendant CDK on behalf of Plaintiff and the Massachusetts Subclass)

109.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.  To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

- 29 -

110.     CDK has been unjustly enriched and has obtained money, earnings, profit and benefits from Plaintiff to which CDK is not otherwise entitled and which it would not have obtained but for its misappropriation of the economic value of dealer data owned by them.  CDK's practices were intentional, knowing, malicious and done with the intent to reap significant benefits at the expense of Plaintiff and the Massachusetts Subclass.  CDK consciously accepted the benefits and continues to do so as of the date of this filing.  Furthermore, CDK has overcharged dealers, who made purchases of DMS and Integration Services at prices that were more than they would have been but for CDK's unlawful actions.  Plaintiff and the Massachusetts Subclass have conferred upon CDK an economic benefit in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Massachusetts Subclass.

111.     CDK's financial benefits resulting from its unlawful and inequitable acts are traceable to CDK's overcharges for data integration with its DMS, which were paid by Vendors and passed through to Plaintiff and the Massachusetts Subclass.

112.     The benefits conferred upon CDK are measurable, in that the revenue CDK has earned due to its unlawful overcharges of DMS and Integration Services are ascertainable by review of sales records.

113.     It would be inequitable under unjust enrichment principles for CDK to be permitted to retain the unjust enrichment it obtained by seizing and selling access to dealers' data and by overcharging for DMS and Integration Services derived from CDK's unlawful, unfair and unconscionable practices as alleged in this Complaint.  CDK should be stripped of its ill-gotten gains resulting from unauthorized interference with data belonging to Plaintiff and the Massachusetts Subclass and be compelled to disgorge to Plaintiff and the Massachusetts Subclass its unlawful or inequitable proceeds.

114.     CDK should also be compelled to disgorge any overcharge resulting from its sales of DMS and Integration Services.  Furthermore, a constructive trust should be imposed upon all unlawful or inequitable sums received by CDK that are traceable to indirect purchases of DMS and Integration Services by Plaintiff and the Massachusetts Subclass.

115.     Plaintiff and the Massachusetts Subclass have no adequate remedy at law.  By engaging in the foregoing unlawful or inequitable conduct, CDK has been unjustly enriched in violation of the common law of Massachusetts, as outlined below.

116.     CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Massachusetts dealers, including Plaintiff and the Massachusetts Subclass.  CDK profited by charging Vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Integration Services in Massachusetts at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Massachusetts Subclass have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges to the economic detriment of Plaintiff and the Massachusetts Subclass.   CDK was aware of or appreciated the benefit conferred upon it by Plaintiff and the Massachusetts Subclass and under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Massachusetts Subclass.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

A.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3);

B.     Direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class and the Massachusetts Subclass;

C.     Designate Plaintiff as representative of the Class and the Massachusetts Subclass;

D.      Enter a judgment awarding Plaintiff, the Class and the Massachusetts Subclass damages against Defendants as a result of Defendants' unlawful conduct alleged in this Complaint, plus treble damages and all other available damages, including any statutory or liquidated damages or otherwise;

E.      Award to Plaintiff, the Class and the Massachusetts Subclass their costs of suit, including reasonable attorneys' and experts' fees and expenses;

F.      Order that Defendants, their directors, officers, employees, agents, successors, members and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing any additional violations of the law as alleged herein; and

G.      Award any other and further relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury on all issues that can be tried to a jury.

DATED:  February 7, 2018                         ROBBINS GELLER RUDMAN
                                                                    & DOWD LLP
                                                          JAMES E. BARZ (IL Bar # 6255605)
                                                          FRANK RICHTER (IL Bar # 6310011)


                                                                 s/ James E. Barz
                                                          JAMES E. BARZ

                                                          200 South Wacker Drive, 31st Floor
                                                          Chicago, IL  60606
                                                          Telephone:  312/674-4674
                                                          312/674-4676 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
MARK J. DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
MICHAEL J. NICOUD
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)

Attorneys for Plaintiff